# EXHIBIT A

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 2 of 80 PageID #: 27

SUPREME COURT OF THE STATE OF NEW YORK
SUFFOLK COUNTY

-----------------------------------------------------------------------X
ANTHONY COLAS;

NIKKI BUSKEY;

JOSEPH CASILLI;

VALERIE DAVIS;

VINCENT DIXON;

BARBARA DOTSON;

EDWARD FOLKL;

SUZANNE HILL;

ELISA HINKEN;

LINDA HOWELL As The Proposed Administrator Of THE
ESTATE OF JEFFREY HOWELL;

SEAN HUTCHINS;

JESSICA JORDAN;

STEPHANIE KELLER;

EMILY DIANE KICKLIGHTER;

JERRY LEOPOLD;

ROBERT LOUNSBURY;

YVETTE MARIANI;

ANDREW MARZEC;

JAMES MCILWEE;

CASEY PAYANO;

PETER QUINN;

VINCENT ROMANO;

ROBERT SHANE;

MICHAEL SMITH;

ROBERT VAIL;

JOSEPH VINCHIARELLO;

REGINALD WADLINGTON;

PATRICIA WOODS;

DENNIS WUCHTER;
                          *Plaintiffs,*

        -*against* -

3M COMPANY f/k/a Minnesota Mining and
Manufacturing Co.;

AGC CHEMICALS AMERICAS, INC.;

ARCHROMA U.S., INC.;

ARKEMA INC.;

Index No. _____/2025

**SUMMONS**

Venue is designated pursuant to
CPLR § 503(a) & (c) in that
Plaintiff Anthony Colas Resides
in this county.

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 3 of 80 PageID #: 28

BASF CORPORATION;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA INC.;
DUPONT DE NEMOURS INC. f/k/a DowDuPont, Inc.;
EIDP, INC. f/k/a E.I. du Pont de Nemours and Company;
HONEYWELL INTERNATIONAL, INC., f/k/a Allied
Signal Inc.;
SOLVAY CHEMICALS INC.;
W. L. GORE ASSOCIATES, INC.;

                              *Defendants.*
        -----------------------------------------------------------------------X

To the above-named Defendant:

        You are hereby summoned to answer the Complaint in this action, and to serve a copy of

your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of

Appearance on the Plaintiffs' attorneys within twenty (20) days after the service of this Summons,

exclusive of the day of service, where service is made by delivery upon you personally within the

state, or, within thirty (30) days after completion of service where service is made in any other

manner. In case of your failure to appear or answer, judgment will be taken against you by default

for the relief demanded in the Complaint.

Dated: New York, New York
        January 3, 2025

                                                Napoli Shkolnik, PLLC
                                                *Attorneys for Plaintiff*

                                                */s/ Nicholas Mindicino*
                                                Nicholas Mindicino, Esq.
                                                360 Lexington Avenue, 11th Floor
                                                New York, New York   10017

                                        2

212-397-1000
NMindicino@napolilaw.com

TO:

3M COMPANY f/k/a Minnesota Mining and Manufacturing Co.;
c/o CORPORATION SERVICE COMPANY
80 STATE STREET,
ALBANY, NY, 12207 – 2543

AGC CHEMICALS AMERICAS, INC.;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

ARCHROMA U.S., INC.;
5435 77 CENTER DR, # 10,
CHARLOTTE, NC, UNITED STATES, 28217 - 0725

ARKEMA INC.;
c/o CORPORATION SERVICE COMPANY
80 STATE STREET,
ALBANY, NY, 12207 – 2543

BASF CORPORATION;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

THE CHEMOURS COMPANY;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

THE CHEMOURS COMPANY FC, LLC;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

CLARIANT CORPORATION;

3

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 5 of 80 PageID #: 30

c/o CORPORATION SERVICE COMPANY
80 STATE STREET,
ALBANY, NY, 12207 – 2543

CORTEVA, INC.;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

DAIKIN AMERICA INC.;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

DUPONT DE NEMOURS INC. f/k/a DowDuPont, Inc.;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

EIDP, INC. f/k/a E.I. du Pont de Nemours and Company;
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

HONEYWELL INTERNATIONAL, INC., f/k/a Allied Signal Inc.;
c/o CORPORATION SERVICE COMPANY
80 STATE STREET,
ALBANY, NY, 12207 – 2543

SOLVAY CHEMICALS INC.
c/o CORPORATION SERVICE COMPANY
80 STATE STREET,
ALBANY, NY, 12207 – 2543

W. L. GORE ASSOCIATES, INC.
c/o C T CORPORATION SYSTEM
28 LIBERTY ST.,
NEW YORK, NY, 10005

4

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 6 of 80 PageID #: 31

SUPREME COURT OF THE STATE OF NEW YORK
SUFFOLK COUNTY

---------------------------------------------------------------------X

ANTHONY COLAS;

NIKKI BUSKEY;

JOSEPH CASILLI;

VALERIE DAVIS;

VINCENT DIXON;

BARBARA DOTSON;

EDWARD FOLKL;

SUZANNE HILL;

ELISA HINKEN;

LINDA HOWELL As The Proposed Administrator Of THE
ESTATE OF JEFFREY HOWELL;

SEAN HUTCHINS;

JESSICA JORDAN;

STEPHANIE KELLER;

EMILY DIANE KICKLIGHTER;

JERRY LEOPOLD;

ROBERT LOUNSBURY;

YVETTE MARIANI;

ANDREW MARZEC;

JAMES MCILWEE;

CASEY PAYANO;

PETER QUINN;

VINCENT ROMANO;

ROBERT SHANE;

MICHAEL SMITH;

ROBERT VAIL;

JOSEPH VINCHIARELLO;

REGINALD WADLINGTON;

PATRICIA WOODS;

DENNIS WUCHTER;

                          *Plaintiffs,*

      *-against -*

3M COMPANY f/k/a Minnesota Mining and
Manufacturing Co.;

Index No. _____/2025

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Trial by jury is desired in the
County of Suffolk

Venue is designated pursuant to
CPLR § 503(a) & (c) in that
Plaintiff Anthony Colas resides in
this county.

5

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 7 of 80 PageID #: 32

AGC CHEMICALS AMERICAS, INC.;
ARCHROMA U.S., INC.;
ARKEMA INC.;
BASF CORPORATION;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
CLARIANT CORPORATION;
CORTEVA, INC.;
DAIKIN AMERICA INC.;
DUPONT DE NEMOURS INC. f/k/a DowDuPont, Inc.;
EIDP, INC. f/k/a E.I. du Pont de Nemours and Company;
HONEYWELL INTERNATIONAL, INC., f/k/a Allied
Signal Inc.;
SOLVAY CHEMICALS INC.;
W. L. GORE ASSOCIATES, INC;

         *Defendants.*

------------------------------------------------------------------------X

## **COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs ANTHONY COLAS; NIKKI BUSKEY; JOSEPH CASILLI; VALERIE

DAVIS; VINCENT DIXON; BARBARA DOTSON; EDWARD FOLKL; SUZANNE HILL;

ELISA HINKEN; LINDA HOWELL AS THE PROPOSED ADMINISTRATOR OF THE

ESTATE OF JEFFREY HOWELL; SEAN HUTCHINS; JESSICA JORDAN; STEPHANIE

KELLER; EMILY DIANE KICKLIGHTER; JERRY LEOPOLD; ROBERT LOUNSBURY;

YVETTE MARIANI; ANDREW MARZEC; JAMES MCILWEE; CASEY PAYANO; PETER

QUINN; VINCENT ROMANO; ROBERT SHANE; MICHAEL SMITH; ROBERT VAIL;

JOSEPH VINCHIARELLO; REGINALD WADLINGTON; PATRICIA WOODS; AND

DENNIS WUCHTER; ("Plaintiffs"), by and through their undersigned counsel, hereby file this

6

Case 2:25-cv-00869-DG-ARL Document 1-1 Filed 02/14/25 Page 8 of 80 PageID #: 33

Complaint against Defendants, 3M COMPANY F/K/A MINNESOTA MINING AND MANUFACTURING CO.; AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA INC.; DUPONT DE NEMOURS INC. F/K/A DOWDUPONT, INC.; EIDP, INC. F/K/A E.I. DU PONT DE NEMOURS AND COMPANY; HONEYWELL INTERNATIONAL, INC., F/K/A ALLIED SIGNAL INC.; SOLVAY CHEMICALS INC.; AND W. L. GORE ASSOCIATES, INC, (collectively "Defendants") and alleges, upon information and belief, as follows:

### **INTRODUCTION**

1.      This action arises from the foreseeable contamination of groundwater by the use of per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA"), Perfluorohexanesulfonic acid ("PFHxS"), perfluorononanoic acid (PFNA), Hexafluoropropylene oxide dimer acid ("HFPO-DA" or "GenX"), and other dangerous PFAS chemicals.  PFAS are a group of synthetic chemicals that are resistant to oil, water, grease, and heat.

2.      Since at least the 1950s, PFAS have been used in wide range of products and applications, including but not limited to: non-stick cookware, fast food packaging, shampoo, paints, stain- and water-resistant fabrics and carpeting, cleaning products, and many others. However to be clear, Plaintiffs do not in this Complaint assert claims regarding any PFAS containing products produced by defendants for sale to the United States Government, and/or produced in compliance with technical standards set by the United States Government such as Military Specifications.

7

3.      PFAS are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain.  PFAS are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.[1]

4.      At various times from the 1950s through today, Defendants designed, manufactured, marketed, distributed, and/or sold products containing PFOS, PFOA, PFHxS, PFNA, GenX, and/or other dangerous PFAS and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluorinated chemicals ("PFCs") which are used in the manufacture of PFAS-containing products.

5.      Defendants designed, manufactured, marketed, distributed, and/or sold their products despite knowing that PFAS are toxic, persist indefinitely, and would be routinely released into the environment, even when used as directed and intended by Defendants.

6.      Since the creation of PFAS chemicals in the 1950s, PFAS products designed, manufactured, marketed, distributed, and/or sold by Defendants, and/or contained fluorosurfactants and/or PFCs designed, manufactured, marketed, distributed, and/or sold by Defendants, have been used as directed and intended by Defendants, but which nevertheless resulted in the release of dangerous PFAS into the environment, thereby causing widespread PFAS contamination.

---

[1] Science continues to develop as to which specific human health effects are linked to PFAS exposure. The list above is a non-exhaustive list of some of the most widely accepted human health effects caused by PFAS exposure.

8

7.      Due to this contamination, Plaintiffs have suffered real personal injuries, bioaccumulation of PFAS in their bodies, property damage and the diminution in value of their properties as a result of the release of PFAS to their water supplies.

8.      Plaintiffs have suffered an assortment of diseases and medical conditions as a direct result of their exposure to the PFAS contamination present in their drinking water supply and/or through direct exposure to PFAS-containing products.

9.      Plaintiffs, as residents and those who visited, worked, or otherwise dwelled in the contaminated areas, have been unknowingly exposed for many years to PFAS, including concentrations hazardous to their health.

10.     Plaintiffs' unwitting exposure to PFAS in their water supply and in consumer products as a result of the Defendants' conduct is the direct and proximate cause of Plaintiffs' injuries.

11.     Plaintiffs' property has been damaged as a result of the presence of PFAS in their water supply.

12.     Plaintiffs seek recovery from Defendants for injuries, damages, and losses suffered by the Plaintiffs as a result of exposure to the introduction of PFAS and other toxic substance into their water supply, and then into their properties and bodies, in an amount to be determined at trial, exclusive of interest, costs, and attorneys' fees.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction because Defendant Daikin America Inc's principal place of business is located at 20 Olympic Dr, Orangeburg, New York 10962.

9

14.     Venue is proper in this Court under CPLR §503(a) because the events, omissions and harms that are the basis of Plaintiffs' claims occurred in substantial part in this County. Furthermore, one or more Plaintiff described below resides within this County.

15.     This Court has personal jurisdiction over Defendants by virtue of each Defendants' regular and systematic contacts with New York, including, among other things, purposefully marketing, selling and/or distributing their products to and within New York, and because they have the requisite minimum contacts with New York necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

## PARTIES

### A.     Plaintiffs

16.     Anthony Colas resides at 80 Williams Ave Amityville NY 11701. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Hypothyroidism and Ulcerative Colitis.

17.     Nikki Buskey resides at 1046 2nd Ave 1st Floor R Schenectady NY 12303. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades.

10

INDEX NO. 600184/2025
Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 12 of 80 PageID #: 37
RECEIVED NYSCEF: 01/03/2025

Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer, Preeclampsia, and Ulcerative Colitis.

18.    Joseph Casilli resides at 52 Avenue A Cornwall-on-Hudson NY 12520. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Testicular Cancer.

19.    Valerie Davis resides at 25 Troy Ln Highland NY 12528. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Hyperthyroidism.

20.    Vincent Dixon resides at 870 Manor Rd. Staten Island NY 10314. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

11

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

21.     Barbara Dotson resides at 262 Magnolia St Rochester NY 14611. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Hypothyroidism.

22.     Edward Folkl resides at 6 Scotchtown Pl. Middletown NY 10941. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

23.     Suzanne Hill resides at 201 Patterson St Groveland FL 34736. Plaintiff previously resided in New York and was exposed to PFAS contamination during such time. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

12

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM          INDEX NO. 600184/2025

NYSCEF DOC. NO. 1          Case 2:25-cv-00869-DG-ARL          Document 1-1          Filed 02/14/25          Page 14 of 80 PageID #:
39          RECEIVED NYSCEF: 01/03/2025

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's

exposure, Plaintiff has been diagnosed with Thyroid Cancer.

24.    Elisa Hinken resides at 15 Brafmans Road Inwood NY 11096. Plaintiff has been

exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing

elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products

and/or was directly exposed to various household product containing PFAS over decades. Plaintiff

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's

exposure, Plaintiff has been diagnosed with Kidney Cancer and Hyperthyroidism.

25.    Linda Howell as the Proposed Administrator of the Estate of Jeffrey Howell resides

at 3173 Van Dorn Corners Road Ithaca NY 14850. Prior to Decedent's death, Decedent had been

exposed to PFAS through daily activity. Decedent regularly consumed drinking water containing

elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products

and/or was directly exposed to various household product containing PFAS over decades.

Decedent was exposed to PFAS for many years prior to development of Plaintiff's personal

injuries, including at concentrations hazardous to their health. As a direct and proximate result of

Decedent's exposure, Decedent was diagnosed with Kidney Cancer.

26.    Sean Hutchins resides at 3910 Saint Ivy Ave. Myrtle Beach SC 29588. Plaintiff

previously resided in New York and was exposed to PFAS contamination during such time.

Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking

water containing elevated levels of PFAS as a result of the widespread use of PFAS containing

consumer products and/or was directly exposed to various household product containing PFAS

13

over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Ulcerative Colitis.

27.     Jessica Jordan resides at 2440 Wallen Ln N Bellmore NY 11710. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Hypothyroidism.

28.     Stephanie Keller resides at 121 Palomino Dr. King NC 27021. Plaintiff previously resided in New York and was exposed to PFAS contamination during such time. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Thyroid Disease.

29.     Emily Diane Kicklighter resides at 4723 Cliff Ave Louisville KY 40215. Plaintiff previously resided in New York and was exposed to PFAS contamination during such time. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing

consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Preeclampsia.

30.    Jerry Leopold resides at 15560 Avery Rd. Pt Charlotte FL 33981. Plaintiff previously resided in New York and was exposed to PFAS contamination during such time. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

31.    Robert Lounsbury resides at 2 Wes Way Beacon NY 12508. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

32.    Yvette Mariani resides at 124 Humboldt Street Brooklyn NY 11206. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer

15

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 17 of 80 PageID #: 42

products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

33. Andrew Marzec resides at 61 Musiker Ave. Randolph NJ 165374. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Testicular Cancer.

34. James McIlwee resides at 15 Derby Rd Hicksville NY 11801. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

35. Casey Payano resides at 1133 Ogden av 12R Bronx NY 10452. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff

16

Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 18 of 80 PageID #: 43

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Thyroid Cancer and Thyroid Disease.

36.     Peter Quinn resides at PO Box 448 New Lebanon NY 12125. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer and Thyroid Cancer.

37.     Vincent Romano resides at 27 Mark Twain Ln Setauket- East Setauket NY 11733. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Ulcerative Colitis.

38.     Robert Shane resides at 31 Forest St. Gloversville NY 12078. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

17

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's

exposure, Plaintiff has been diagnosed with Kidney Cancer.

39.     Michael Smith resides at 7280 Endston Ct New Orleans LA 70128. Plaintiff

previously resided in New York and was exposed to PFAS contamination during such time.

Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking

water containing elevated levels of PFAS as a result of the widespread use of PFAS containing

consumer products and/or was directly exposed to various household product containing PFAS

over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's

personal injuries, including at concentrations hazardous to their health. As a direct and proximate

result of Plaintiff's exposure, Plaintiff has been diagnosed with Hyperthyroidism.

40.     Robert Vail resides at 19 Oakland Avenue Salamanca NY 14779. Plaintiff has been

exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing

elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products

and/or was directly exposed to various household product containing PFAS over decades. Plaintiff

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's

exposure, Plaintiff has been diagnosed with Kidney Cancer.

41.     Joseph Vinchiarello resides at 49 Reimer Ave. Dover Plains NY 12522. Plaintiff

has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water

containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer

products and/or was directly exposed to various household product containing PFAS over decades.

Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries,

18

including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

42.     Reginald Wadlington resides at 42018 Thoroughbred Ln Murrieta CA 92562. Plaintiff previously resided in New York and was exposed to PFAS contamination during such time. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Hyperthyroidism.

43.     Patricia Woods resides at 135 Lakeview Ave Syracuse NY 13204. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Thyroid Cancer.

44.     Dennis Wuchter resides at 81 Joes Hill Rd. Brewster NY 10509. Plaintiff has been exposed to PFAS through daily activity. Plaintiff regularly consumed drinking water containing elevated levels of PFAS as a result of the widespread use of PFAS containing consumer products and/or was directly exposed to various household product containing PFAS over decades. Plaintiff

19

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM
Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 21 of 80 PageID #:
46

was exposed to PFAS for many years prior to development of Plaintiff's personal injuries, including at concentrations hazardous to their health. As a direct and proximate result of Plaintiff's exposure, Plaintiff has been diagnosed with Kidney Cancer.

**B.    Defendants**

45.    **Defendant The 3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M")** is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 3M Center, St. Paul, Minnesota 55144-1000.

46.    Beginning before 1950 and until at least present, 3M designed, manufactured, marketed, distributed, and sold products containing PFAS.

47.    Beginning before 1950 and until at least present, 3M designed, manufactured, marketed, distributed, and sold fluorosurfactants and/or PFCs for use by other companies their products and in other applications.

48.    **Defendant EIDP, Inc. f/k/a E.I. du Pont de Nemours and Company ("E.I. du Pont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

49.    **Defendant The Chemours Company ("Chemours Co.")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware 19899.

50.    In 2015, DuPont spun off its performance chemicals business to Chemours Co., along with vast environmental liabilities which Chemours Co. assumed, including those related to PFAS and fluorosurfactants.

20

51.     Chemours Co. was incorporated as a subsidiary of DuPont as of April 30, 2015. From that time until July 2015, Chemours Co. was a wholly owned subsidiary of DuPont.

52.     In July 2015, DuPont spun off Chemours Co. and transferred to Chemours Co. its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of Chemours Co. stock to DuPont stockholders, and Chemours Co. has since been an independent, publicly traded company.

53.     **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

54.     **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805.

55.     **Defendant Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

56.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

57.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly owned subsidiary of DowDuPont.

21

58.  On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro-rata dividend. Following that distribution, Corteva became the direct parent of E.I. Du Pont de Nemours & Co.

59.  Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

60.  On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva.

61.  Defendants E.I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" or the "DuPont Defendants" throughout this Complaint.

62.  Beginning in the 1950s and until at least present, the Dupont Defendants designed, manufactured, marketed, distributed, and sold products containing PFAS.

63.  Beginning in the 1950s and until at least present, the Dupont Defendants designed, manufactured, marketed, distributed, and sold flurosurfactants and/or PFCs for use by other companies their productions and other applications.

64.  **Defendant Honeywell International, Inc. ("Honeywell") f/k/a Allied Signal Inc. ("Honeywell")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Charlotte, North Carolina.

22

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 24 of 80 PageID #: 49

65.     Honeywell is a Fortune 100 company with a global workforce of approximately 130,000. It serves a variety of industries, including the specialty chemicals industry.

66.     In 1999, Allied-Signal, Inc. acquired Honeywell. The combined company adopted Honeywell's name, however, because of name recognition.

67.     Allied-Signal was an aerospace, automotive, and engineering company that was created through the 1985 merger of Allied Corp. and Signal Companies. Together, these companies had operated in the United States since at least the early 1920s.  Prior to the merger, a significant portion of Allied Corp.'s business was concerned with the chemical industry.

68.     Honeywell produces and sells hundreds of different product lines.

69.     Upon information and belief, Honeywell designed, manufactured, marketed, distributed, and sold products containing PFAS.

70.     Upon information and belief, Honeywell designed, manufactured, marketed, distributed, and sold flurosurfactants and/or PFCs for use by other companies their productions and other applications.

71.     **Defendant W. L. Gore Associates, Inc., ( Gore")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Newark, Delaware.

72.     Gore is a privately held, multinational manufacturing and materials science company.  Gore specializes in the development of membrane and polymer and fluoropolymer products, as well as their manufacture and application to a variety of industries and sectors, including healthcare, life sciences, mobile electronics, automotive, textiles and apparel, and aerospace.

23

73.     Upon information and belief, Gore designed, manufactured, marketed, distributed, and sold products containing PFAS.

74.     Upon information and belief, Gore designed, manufactured, marketed, distributed, and sold flurosurfactants and/or PFCs for use by other companies their productions and other applications.

75.     **Defendant AGC Chemicals Americas, Inc. ("AGC")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 55 East Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341.

76.     On information and belief, AGC Chemicals Americas, Inc. was formed in 2004 and is a subsidiary of AGC Inc., a foreign corporation organized under the laws of Japan, with its a principal place of business in Tokyo, Japan.

77.     AGC manufactures specialty chemicals.  It offers glass, electronic displays, and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

78.     On information and belief, AGC designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS containing products and other applications.

79.     **Defendant Archroma U.S., Inc. ("Archroma")** is a corporation organized and existing under the laws of Delaware, with its a principal place of business at 5435 77 Center Drive, Charlotte, North Carolina 28217.

24

80.    On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

81.    On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS containing products and other applications.

82.    **Defendant Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, with its principal place of business at 900 First Avenue, King of Prussia, Pennsylvania 19406.

83.    Arkema Inc. develops specialty chemicals and polymers.

84.    Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

85.    On information and belief, Arkema Inc. designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS containing products and other applications

86.    **Defendant BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932.

87.    On information and belief, BASF is the successor-in-interest to Ciba. Inc. (f/k/a Ciba Specialty Chemicals Corporation).

88.    On information and belief, BASF and/or Ciba Inc. designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS containing products and other applications

25

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 27 of 80 PageID #: 52

89.     **Defendant Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, with its principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

90.     On information and belief, Clariant is the successor in interest to the specialty chemicals business of Sandoz Chemical Corporation ("Sandoz"). On information and belief, Sandoz spun off its specialty chemicals business to form Clariant in 1995.

91.     On information and belief, Clariant designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS containing products and other applications

92.     **Daikin America Inc. ("Daikin")** is a corporation organized under the laws of the State of New York, with its principal place of business located at 20 Olympic Dr, Orangeburg, New York 10962. Daikin is a subsidiary of Daikin Industries Ltd., a Japanese chemical company.

93.     Daikin is part of the resin, synthetic rubber, and artificial and synthetic fibers and filaments manufacturing industry.

94.     On information and belief, Daikin designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS-containing products and other applications

95.     **Defendant Solvay Chemicals Inc. ("Solvay")** is a corporation organized under the laws of Delaware, with its principal place of business located in Alpharetta, Georgia.

96.     Solvay produces chemical products for the automotive, aerospace, chemicals, and telecommunications sectors.

26

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 28 of 80 PageID #: 53

97.     On information and belief, Solvay designed, manufactured, marketed, distributed, and sold PFCs containing PFAS and/or their chemical precursors for use in manufacturing PFAS-containing products and other applications

98.     All Defendants, at all times material herein, acted by and through their respective agents, servants, officers and employees, actual or ostensible, who then and there were acting within the course and scope of their actual or apparent agency, authority or duties.  Defendants are liable based on such activities, directly and vicariously.

## FACTUAL ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

### A.     PFAS and Their Risk to Public Health

99.     PFAS are chemical compounds containing fluorine and carbon.  These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water.  These substances are not naturally occurring and must be manufactured.

100.    The two most widely studied types of these substances are PFOA and PFOS.  PFOS and PFOA are eight carbon chain PFAS molecules, and are sometimes referred to as "long-chain" PFAS.  PFOA and PFOS have been in wide use since at least the 1950s.

101.    In contrast to long-chain PFAS, PFHxS, PFNA and Gen-X are considered "short-chain" PFAS as they contain molecules with less than eight carbon chains.

102.    There are many other additional forms of PFAS other than those specifically listed above.

103.    In April 2024 the Environmental Protection Agency (EPA) issued Maximum Contaminant Levels (MCLs) for the five forms of PFAS listed above, recognizing their potential

27

for causing human health effects. EPA has also required public water systems to test for 29 different PFAS chemicals as part of is fifth Unregulated Contaminant Monitoring Rule.

104.    Individual states have imposed state level restrictions on other PFAS chemicals. For example, New York has passed regulations preventing the sale of new products in specific product categories containing any form of PFAS, defined as "a class of fluorinated organic chemicals containing at least one fully fluorinated carbon atom."

105.    PFAS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

106.    PFAS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFAS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

107.    PFAS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFAS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

108.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

109.    PFAS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of

28

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 30 of 80 PageID #: 55

time. Because of this stability, any newly ingested PFAS will be added to any PFAS already present. In humans, PFAS remain in the body for years.

110. PFAS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFAS.

111. The chemical structure of PFAS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

112. Exposure to PFAS is toxic and poses serious health risks to humans and animals.

113. PFAS are readily absorbed after consumption or inhalation and accumulate primarily in the bloodstream, kidney, and liver.

114. Beginning in approximately the 1950s, the Defendants created PFAS chemicals which do not occur in nature. Shortly thereafter Defendants began manufacturing, marketing, distributing, and/or selling PFAS chemicals and/or products which contain PFAS or the chemical precursors that degrade into PFAS.

115. On information and belief, Defendants were aware that the PFAS they designed, manufactured, marketed, distributed, and/or sold would be used in the PFAS products designed, manufactured, marketed, distributed, and/or sold by Defendants and others.

116. On information and belief, Defendants designed, manufactured, marketed, distributed, and/or sold the PFAS contained in the PFAS products which was then discharged into the environment, resulting in widespread PFAS contamination.

117. On information and belief, the Defendants designed, manufactured, marketed, distributed, and/or sold the PFAS products which discharged PFAS into the environment resulting in widespread PFAS contamination.

29

**B.      Defendants' Knowledge of the Threats to Public Health and the Environment Posed by PFAS**

118.    On information and belief, by at least the 1950s 3M and DuPont knew or should have known that PFOA and PFOS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

119.    On information and belief, 3M and DuPont concealed from the public and government agencies their knowledge of the threats to public health and the environment posed by PFOA and PFOS.

120.    Defendants other than 3M or DuPont became aware of the dangers of PFAS chemicals at various times beginning in the 1950s.  Such awareness came from a combination of pubic data, internal data and studies, and industry trade secrets and knowledge.

121.    Defendants understood how stable the fluorinated surfactants used in PFAS products are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to safely handle the products or manage wastes generated from their products.

      i.      <u>1940s and 1950s: 3M, DuPont, and the Development of a Toxic Chemical Family</u>

122.    The development of this family of chemical compounds began with Defendant 3M in the 1940s.  At that time, 3M's Central Research Laboratory was working with a scientist at Penn State University, Joseph H. Simons, who had developed and patented a process of preparing fluorine compounds through electrochemical fluorination ("ECF").  In 1945, 3M acquired Simons' ECF patents.  It would be another three years before 3M's Central Research developed fluorinated compounds that could be used for commercial applications.  During that time, 3M scientists

30

continuously researched and created new fluorochemicals; in the words of one researcher, "[a]lmost every day we made a new molecule which had never been on the face of the earth before."[2]

123.    From the early days of its fluorochemical research, 3M recognized the very characteristics that make PFAS persistent pollutants in the environment today.  For example, Simons' 1948 patent for the ECF process, which was assigned to 3M, stated that the compounds produced through ECF are non-corrosive, and of little chemical reactivity, and do not react with any of the metals at ordinary temperatures and react only with the more chemically reactive metals such as sodium, at elevated temperatures.[3]  The patent also stated that the fluorochemicals produced by the ECF process do not react with other compounds or reagents due to the blanket of fluorine atoms surrounding the carbon skeleton of the molecule.  3M understood that the stability of the carbon-to-fluorine bonds prevented its fluorosurfactants from undergoing further chemical reactions or degrading under natural processes in the environment.[4]

124.    3M was also aware of the thermal stability of its fluorinated compounds prior to commercial production.  Simons' ECF patent application states that the compounds produced by

---

[2] Neil McKay, *A Chemical History of 3M: 1933-1990.*
https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1365.pdf

[3] Simons, J. H., Fluorination of Organic Compounds, U.S. Patent No. 2,447,717. August 24, 1948, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1005.pdf.

[4] Simons, J. H., 1950. Fluorocarbons and Their Production. Fluorine Chemistry, 1(12): 401-422, *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3008.pdf.

31

the ECF process were thermally stable at temperatures up to 750° C (1382º F). Additional research by 3M expanded its understanding of the thermal stability of fluorinated compounds.[5]

125.    In 1949, 3M built the first manufacturing facility to expand ECF from laboratory research to commercial production, and it began to present its fluorochemical research in order to find potential uses and customers for the compounds it was manufacturing.

126.    3M soon found a customer: DuPont. In 1951, DuPont began purchasing a perfluorinated carboxylic acid (perfluorooctanoic acid or PFOA) for use in manufacturing a non-stick coating called Teflon.

127.    Even then, 3M's research had already documented that PFAS accumulate in the blood of mice exposed to the chemicals in laboratory tests.[6]  Also, a 1956 study by researchers at Stanford University found that PFAS bind to proteins in human blood.[7]

128.    In 1964, a group of DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace.[8]  They experienced chills, fever, difficulty breathing, and a tightness in the chest—symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in medical literature in 1951.

---

[5] Bryce, T. J., 1950. Fluorocarbons - Their Properties and Wartime Development. Fluorine Chemistry, 1(13): 423-462.

[6] 1950 3M test study results with Perfluorobutyric acid. https://static.ewg.org/reports/2019/pfa-timeline/1950_Mice.pdf?_ga=2.21758526.426747500.1673645134-2012946541.1673645134.

[7] Perfluorooctanoic Acid Interactions with Human Serum Albumin, *available at* https://static.ewg.org/reports/2019/pfa-timeline/1956_Stanford.pdf?_ga=2.59569645.1994765108.1678715813-813372143.1678715813.

[8] Charles E. Lewis and Gerald R. Kerby, *An Epidemic of Polymer-Fume Fever*, 191 JAMA 375 (February 1, 1965).

32

ii.   1960s: PFAS Chemicals Environmental Hazards Come Into Focus

129.   By at least the end of the 1960s, additional research and testing performed by 3M and DuPont indicated that fluorosurfactants, including at least PFOA, because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

130.   One 3M employee wrote in 1964, "This chemical stability also extends itself to all types of biological processes; there are no known biological organisms that are able to attack the carbon-fluorine bond in a fluorocarbon."[9] Thus, 3M knew by the mid-1960s that its fluorosurfactants were immune to chemical and biological degradation in soils and groundwater.

131.   3M also knew by 1964 that fluorocarbon carboxylic acids and fluorocarbon sulfonic acids, when dissolved, dissociated to form highly stable perfluorocarboxylate and perfluorosulfonate ions.   Later studies by 3M on the adsorption and mobility of FC-95 (the potassium salt of PFOS) and FC-143 (the ammonium salt of PFOA) in soils indicated very high solubility and very high mobility in soils for both compounds.[10]

132.   Also, in a 1965 study sponsored by DuPont where rats were fed a PFAS compound over a ninety-day period determined that the rats had liver damage and an showed an increased size in the spleen.

---

[9] Bryce, H.G., Industrial and Utilitarian Aspects of Fluorine Chemistry (1964), *available* at https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX3022.pdf.

[10] Technical Report Summary re : Adsorption of FC 95 and FC143 on Soil, Feb. 27, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1158.pdf.

33

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 35 of 80 PageID #: 60

133.     Despite early warnings of the toxic, persistent, and bioaccumulative nature of PFAS, these chemicals began to be used in products that would be released in large quantities directly into the environment whenever used.

134.     On information and belief, the Defendants designed, manufactured, marketed, distributed, and/or sold PFAS products which ultimately discharged one or more PFAS into the environment resulting in widespread PFAS contamination of the environment, often in multiple forms.

135.     The Defendants treated their PFAS products' formulations as proprietary information and did not disclose the specific chemical ingredients of their formulations to government agencies or the public.

136.     Some or all of the Defendants understood how stable PFAS chemicals are when released into the environment from their first sale to a customer, yet they failed to warn their customers or provide reasonable instruction on how to manage wastes generated from their products.

iii.     1970s-1980s: Defendants Deepening Knowledge of the Risks of PFAS

137.     By at least the 1970s, as Defendants expanded the market for products containing PFAS, 3M and DuPont knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

138.     During the 1970s, 3M also learned that PFAS chemicals accumulated in the human body and were "even more toxic" than previously believed.

34

139.    An internal memo from 3M in 1971 states that "the thesis that there is 'no natural sink' for fluorocarbons obviously demands some attention."[11]  But if 3M did give this issue the attention demanded at this time, it did not share it with the public.

140.    In 1975, two independent toxicologists, Dr. Warren Guy and Donald Taves, discovered that an unidentified fluorine compound had been found in human blood sampled from different blood banks.  Dr. Guy contacted 3M to ask if it knew of "possible sources" of the chemicals.[12]  3M's scientists concluded internally that the fluorine compounds resembled PFOS manufactured by 3M, but 3M did not share this conclusion with the independent toxicologists or anyone else outside of 3M.

141.    3M did, however, test the blood of its own workers in 1976, finding "up to 1000 times 'normal' amounts of organically bound fluorine in their blood."[13]

142.    By the mid-1970s, 3M and other Defendants had an intimate understanding of the persistent nature of PFCs.  A 1976 study, for example, observed no biodegradation of FC-95, the potassium salt of PFOS; a result 3M characterized as "unsurprising" in light of the fact that "[b]iodegradation of FC 95 is improbable because it is completely fluorinated."[14]

143.    A 1978 3M biodegradation study likewise reported that an "extensive study strongly suggest[ed]" one of its PFAS was "likely to persist in the environment for extended period

---

[11] Memorandum from H.G. Bryce to R.M. Adams re : Ecological Aspects of Fluorocarbons, Sept. 13, 1971, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1088.pdf.

[12] Memorandum from G.H. Crawford to L.C. Krogh et al. re: Fluorocarbons in Human Blood Plasma, Aug. 20, 1975, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1118.pdf.

[13] 3M Chronology – Fluorochemicals in Blood, Aug. 26, 1977, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1144.pdf.

[14] Technical Report Summary, August 12, 1976 [3MA01252037].

35

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 37 of 80 PageID #: 62

unaltered by metabolic attack."[15]  A year later, a 3M study reported that one of its fluorosurfactants "was found to be completely resistant to biological test conditions," and that it appeared waterways were the fluorosurfactant's "environmental sink."[16]

144.    At the same time, several studies sponsored by 3M showed that the fluorosurfactants used in PFAS products were even more toxic than previously believed.  A study of subacute toxicity in rhesus monkeys, in which the monkeys were to be given doses of PFOS over ninety days, had to be redesigned and repeated "[b]ecause of unexpected early mortalities in all monkeys at all levels."[17]  None of the monkeys survived past twenty days.  As a summary of the study stated, PFOS "proved to be considerably more toxic to monkeys than anticipated[.]"  In addition, PFOA reduced the survival rate of fathead minnow fish eggs,[18] and PFOS and PFOA were shown to be toxic to rats.[19]  As the summary documented observed, "[b]ecause of the apparent

---

[15] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - II, Jan. 1, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1153.pdf.

[16] Technical Report Summary re : Fate of Fluorochemicals in the Environment, Biodegradation Studies of Fluorocarbons - III, July 19, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1179.pdf.

[17] Ninety-Day Subacute Rhesus Monkey Toxicity Study, Dec. 18, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1191.pdf; Aborted FC95 Monkey Study, Jan. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1193.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, *available at* https://static.ewg.org/reports/2019/pfa-timeline/1977_Most%20Toxic.pdf?_ga=2.34744996.426747500.1673645134-2012946541.1673645134.

[18] The Effects of Continuous Aqueous Exposure to 78.03 on Hatchability of Eggs and Growth and Survival of Fry of Fathead Minnow, June 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1176.pdf.

[19] Acute Oral Toxicity ($LD_{50}$) Study in Rats (FC-143), May 5, 1978, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1170.pdf; FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.

36

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 38 of 80 PageID #: 63

persistence of these fluorochemicals in the body, *the most important question remains possible long term effects*."[20]

145.    In 1979, 3M also completed a comprehensive biodegradation and toxicity study covering investigations between 1975 and 1978.[21]  More than a decade after 3M began selling products containing fluorosurfactants it wrote: "there has been a general lack of knowledge relative to the environmental impact of these chemicals."  The report ominously asked, "If these materials are not biodegradable, what is their fate in the environment?"[22]

146.    In 1979, 3M and DuPont discussed 3M's discovery of high levels of PFOS in the blood of its workers.  Both companies came to the same conclusion that there was "no reason" to notify the EPA of the finding.[23]  3M told the EPA in 1980 only that it had discovered PFOS in the blood of "some of our plant employees."

147.    By at least the end of the 1980s, additional research and testing performed by Defendants, including at least 3M and DuPont, indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among workers exposed to such materials, including at least PFOA, but such data was

---

[20] *Id.* (FC-95, FC-143 and FM-3422 – 90 Day Subacute Toxicity Studies Conducted at IRDC – Review of Final Reports and Summary, Mar. 20, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1199.pdf.)

[21] Technical Report Summary, Final Comprehensive Report on FM 3422, Feb. 2, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2563.pdf.

[22] 3M Internal Correspondence from R. Howell to C. Olsen re: Fluorochemicals in the Environment with attachments, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1372.pdf.

[23] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf.

37

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 39 of 80 PageID #: 64

not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

148.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers at its Washington Works plant in Parkersburg, West Virginia, where it had been using 3M's PFOA to manufacture Teflon since 1951. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[24]

149.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[25] That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[26] This finding was later shared with DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[27]

150.    In 1984, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers, leading one of the company's medical officers to warn in an internal memo: "we must

---

[24] C-8 Blood Sampling Results, *available at* http://tiny.cc/v8z1mz.

[25] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[26] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[27] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

38

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 40 of 80 PageID #: 65

view this present trend with serious concern. It is certainly possible that . . . exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[28]

151.    The same year, DuPont tested drinking water near its Washington Works plant and found elevated PFOA levels in the water, but, after deciding that limiting PFOA discharge from the plant would not be "economically attractive," it did nothing to reduce contamination from the plant.

### iv.    1990s-2000s: 3M and DuPont Under Scrutiny

152.    Federal law requires chemical manufacturers and distributors to immediately notify the EPA if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

153.    Despite its decades of research, 3M waited until May 1998 to submit a report to the EPA under TSCA Section 8(e). Even in that submission, however, 3M downplayed what it knew, according to a former employee:

> Just before that submission we found PFOS in the blood of eaglets—eaglets still young enough that their only food consisted of fish caught in remote lakes by their parents. This finding indicates a widespread environmental contamination and food chain transfer and probable bioaccumulation and bio-magnification. This is a very significant finding that the 8(e) reporting rule was created to collect. 3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information.[29]

---

[28] Memorandum from D.E. Roach to P.F. Riehle re: Organic Fluorine Levels, Aug. 31, 1984, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1313.pdf.

[29] Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

154.    Although 3M acknowledged, in 1998, the presence of PFOS in the blood of the general population, it insisted that it did not "believe that any reasonable basis exists to conclude that PFOS 'presents a substantial risk of injury to health or the environment.'" Internally, the message was quite different: 3M's Manager of Corporate Toxicology advised the company to replace "PFOS-based chemistry as these compounds [are] *VERY persistent and thus insidiously toxic*."

155.    In 2000, 3M, after half a century of manufacturing fluorinated chemicals through ECF, announced that it would phase out its production of several long-chain PFAS compounds, including PFOS, although it continued to manufacture other PFAS chemicals using short-chain chemistry.

156.    In December 2022, 3M finally announced a plan to phase out remaining PFAS manufacturing by the end of 2025.

157.    In April 2006, 3M agreed to pay EPA a penalty of more than $1.5 million after being cited for 244 violations of the TSCA, which included violations for failing to disclose studies regarding PFOS, PFOA, and other PFCs dating back decades.

158.    Likewise, in December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against DuPont based on evidence that it violated the TSCA by concealing the environmental and health effects of PFOA.

159.    On information and belief, Defendants knew or should have known that products containing PFOA or PFOS would very likely injure and/or threaten public health and the environment, even when used as intended or directed.

40

160.    Defendants failed to warn of these risks to the environment and public health, including the impact of their products on the quality of unprotected water sources.

161.    Defendants were all sophisticated and knowledgeable in the art and science of designing, formulating, and manufacturing PFAS products.  They understood far more about the properties of their products—including the potential hazards they posed to human health and the environment—than any of their customers.  Still, Defendants declined to use their sophistication and knowledge to design safer products.

### C.    The Impact of PFAS on the Environment and Human Health Is Finally Revealed

162.    As discussed above, neither 3M, DuPont, nor, on information and belief, any other Defendant complied with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their PFAS products.  *See* TSCA § 8(e).

163.    Despite decades of research, 3M first shared its concerns with EPA in the late 1990s.  In a May 1998 report submitted to EPA, "3M chose to report simply that PFOS had been found in the blood of animals, which is true but omits the most significant information," according to a former 3M employee.[30]

164.    On information and belief, 3M began in 2000 to phase out its production of products that contained PFAS in response to pressure from the EPA.

165.    Once the truth about PFAS was revealed, researchers began to study the environmental and health effects associated with them, including a "C8 Science Panel" formed out

---

[30] *Id.* Letter from R. Purdy, Mar. 28, 1999, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1001.pdf.

41

Case 2:25-cv-00869-DG-ARL     Document 1-1     Filed 02/14/25     Page 43 of 80 PageID #:
68

of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

166.    The C8 Scient Panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases. In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy-induced hypertension (including preeclampsia), and hypercholesterolemia.

167.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birth weight, high uric acid, and high cholesterol. In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

168.    The injuries caused by PFAS can arise months or years after exposure.

169.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

170.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent

42

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 44 of 80 PageID #: 69

C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

171.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

### D.    Federal, State, and International Government Agencies Call for Monitoring and Cleanup of PFAS Contamination

172.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR3"), requiring public water systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[31]

173.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[32]

---

[31] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

[32] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111;

43

174.    On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOS and PFOA.[33]  The EPA developed the HAL to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water.  The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure at 0.07 ppb or 70 ppt.  The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS.  These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects, including:

    a.    Developmental effects to fetuses during pregnancy or to breastfed infants (e.g., low birth weight, accelerated puberty, skeletal variations);

    b.    Cancer (testicular and kidney);

    c.    Liver effects (tissue damage);

    d.    Immune effects (e.g., antibody production and immunity);

    e.    Thyroid disease and other effects (e.g., cholesterol changes).

175.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of PFCs.  The NTP concluded that both PFOA and PFOS are "presumed to be an

---

http://dx.doi.org/10.1289/ehp.1509934.

[33] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

44

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 46 of 80 PageID #: 71

immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[34]

176.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[35]

177.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[36]

178.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate PFC contamination from military bases, as well as devoting $7 million toward the Investing in Testing

---

[34] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf.

[35] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

[36] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

45

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 47 of 80 PageID #: 72

Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[37]

179.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[38]

180.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[39] Following a public comment period on its proposed decision, the EPA will decide whether to move forward with the process of establishing a national primary drinking water regulation for PFOA and PFOS.

181.    On June 15, 2022, the EPA released new drinking water health advisory levels (HALs) for four PFAS, including new interim HALs for PFOS and PFOA that departed significantly from the 2016 EPA HAL they replaced.[40] Specifically, EPA issued HALs of 0.004 ppt for PFOA and 0.02 ppt for PFOS,[41] which collectively accounted for only a small fraction of

---

[37] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[38] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

[39] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

[40] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[41] *Id.* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

46

FILED: SUFFOLK COUNTY CLERK 01/02/2025 05:31 PM

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 48 of 80 PageID #: 73

the combined 70 ppt HAL that preceded them.  Importantly, EPA set these interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels.

182.    As support for its decision, EPA explained that the science had evolved since 2016 and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer."[42] Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the agency planned to adopt for the two chemicals under the SDWA.  Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS – including near zero for certain health effects."[43]  For this reason, the agency determined there was a "pressing need to provide updated information on the current best available science to public health officials prior to finalization of the health effects assessment."[44]

---

[42] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf.

[43] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[44] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June

47

Case 2:25-cv-00869-DG-ARL     Document 1-1     Filed 02/14/25     Page 49 of 80 PageID #: 74

183.    Because the referenced health analyses were still undergoing final review by EPA's Science Advisory Board, the agency stated that the new interim HALs for PFOS and PFOA are subject to change.  EPA indicated, however, that it did not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[45] that applies to Public Water Systems.[46]

184.    On September 6, 2022, EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under CERCLA.[47]  Pursuant to that notice, all comments from the public were required to be submitted by November 7, 2022.

185.    On October 5, 2022, the Governor of New York signed legislation (S.8763A/A.9824A) allowing public water suppliers to revive any action, civil claim, or cause of action involving an emerging contaminant in drinking water that may have been barred because the statute of limitations had expired.

---

2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

[45] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[46] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[47] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022).

48

186.    The legislation defines an emerging contaminant as any physical, chemical, microbiological, or radiological substance that is identified or listed as an emerging contaminant in public health or any other law, which would include the PFAS chemicals at issue in this action.

187.    The law gives local water authorities until April 5, 2024, to pursue actions against polluters to recover the costs of treatment and filtration as a result of contamination that might otherwise be barred under the statute of limitations.

188.    On January 6, 2023, the Defense Logistics Agency within the Department of Defense published a new Military Specification  for "Fire Extinguishing Agent, Fluorine-Free Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[48]  This new specification will govern fire extinguishing foams used by all Department of Defense organizations and will require such foams to test "non-detect" for PFAS.  The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

189.    On April 10, 2024, EPA announced the final National Primary Drinking Water Regulation for six PFAS. EPA's rule created final MCLs of 4.0 ppt PFOA or PFOS and 10.0 PPT PFHxS, PFNA or Gen-X in drinking water.[49]

### E.    PFAS Is Fungible and Commingled in the Groundwater

190.    PFAS chemicals once released to the environment, lack characteristics that would enable identification of the company that manufactured that particular chemical feedstock.

---

[48] Available on the Defense Logistics Agency's website, https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.
[49] Federal Register / Vol. 89, No. 82 Available at https://www.govinfo.gov/content/pkg/FR-2024-04-26/pdf/2024-07773.pdf

49

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 51 of 80 PageID #: 76

191.    A subsurface plume, even if it comes from a single location, originates from mixed batches of PFAS and chemical feedstock coming from different manufacturers.

192.    Because precise identification of the specific manufacturer of any given PFAS product found at a PFAS release site is nearly impossible, given certain exceptions, Plaintiffs herein pursue all Defendants, jointly and severally and/or on alternative, enterprise, industrywide market share, and concerted action theories.

193.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of products containing PFAS, at Plaintiffs' expense, and to attempt to avoid liability.

### F.    Defendants Marketed and Sold a Wide Variety of Products Containing Dangerous PFAS Chemicals

194.    Despite their knowledge and growing awareness of the dangers of PFAS chemicals, Defendants continued to produce, market, distribute, and sell a variety of products containing PFAS.

195.    Each Defendant engaged in the marketing, selling and/or distributing of PFAS containing products in the State of New York.

196.    Defendants understood that the PFAS containing products they produced would cause various forms of environmental contamination, which in turn would cause people such as Plaintiffs to be at significant risk of exposure to PFAS as a result of their exposure to such contamination.

197.    Defendants understood that the PFAS-containing products they produced would enter the stream of commerce in the states and territories of the United States, including this State,

50

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 52 of 80 PageID #: 77

and that people such as Plaintiffs would directly interact with those products thereby creating the significant risk of direct exposure to PFAS as a result.

198.     Defendants understood that the PFAS containing products they produced would eventually enter ground and surface water, either directly or indirectly, causing contamination of water resources and in turn the drinking water sourced from them, and cause people such as Plaintiffs to be at significant risk of adverse exposure to PFAS from their contaminated drinking water.

199.     Defendants understood that the PFAS containing products they produced would cause contamination of soil and cause people such as Plaintiffs to be at significant risk of exposure to PFAS as a result of their exposure to such contamination.

200.     Defendants understood that the PFAS containing products they produced would cause contamination of air and cause people such as Plaintiffs to be at significant risk of exposure to PFAS as a result of their exposure to such contamination.

201.     A study by the United States Geological Survey found that at least one PFAS could be detected in about 45% of US drinking-water samples.[50]  Upon information and belief, the PFAS and/or PFAS-containing products produced by Defendants represents a significant proportion of that contamination.

202.     DuPont began used PFOA and other PFAS in its specialty chemical production applications, including household applications and products, like Teflon and Stainmaster.  DuPont

---

[50] Smalling, *Per- and polyfluoroalkyl substances (PFAS) in United States tapwater: Comparison of underserved private-well and public-supply exposures and associated health implications* (August 2023), *available at*: https://www.sciencedirect.com/science/article/pii/S0160412023003069?via%3Dihub.

51

Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 53 of 80 PageID #: 78

advertised Teflon as a protective non-stick coating for cookware and Stainmaster as a soil and stain repellant for fabrics and textile products.  For instance, DuPont released Stainmaster Carpet in 1986.  DuPont advertised this product as being helpful for families with children and pets, which is particularly concerning due to the additional exposure for children, who spend more time on or near the floor.

203.    DuPont also manufactured and advertised Zonyl as a cheaper and less labor-intensive alternative to wax-paper food packaging beginning in the 1960s.  On information and belief, this material has been used for fast food packaging and microwave popcorn bags, among other consumer uses.

204.    On information and belief, the Teflon PTFE chemical has been used in a wide variety of cosmetics to make them long-lasting and easier to apply.

205.    DuPont, on information and belief, was releasing advertisements encouraging families not to worry, because they had Teflon® carpet protector.

206.    Despite knowledge of potential health hazards and contamination, DuPont introduced Stainmaster carpet to the public in 1986, spending $10 million on the first campaign of national advertisements.  DuPont marketed Stainmaster carpet as safe for families and targeted families with babies in particular, through advertisements such as those below, whose misleading messages DuPont aimed to get into every American household.

207.     However, infants and toddlers in homes with Stainmaster carpets are consistently exposed to PFAS.  According to the Centers for Disease Control and Prevention, infants and toddlers are at increased risk of ingesting these chemicals through hand to mouth transfer of PFAS

52

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 54 of 80 PageID #: 79

from carpets.  Similarly, the EPA reported that children are particularly susceptible to inhaling PFAS in carpets, with inhalation levels reaching 32,500 pg/cm3.

208.    DuPont also continued to advertise its Teflon  brand for household use, touting nonstick benefits but failing to disclose to consumers the serious adverse effects of PFAS.  On information and belief, the advertisements below are from the 1990s.



53



209.   Despite its knowledge regarding PFOA's toxicity, DuPont continued to claim that PFOA posed no health risks.  On information and belief, DuPont continued to market and sell Teflon containing PFOA until 2007.

210.   DuPont advertised and sold consumer brands using PFAS chemicals as safe for home use in a variety of contexts.

54

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 56 of 80 PageID #: 81

211.    Upon information and belief, DuPont has marketed and sold PFAS containing products and PFAS chemicals for use in products and applications of other companies without disclosing the risks of these chemicals.

212.    3M has advertised and sold brands of PFAS-containing products, such as Scotchgard, as consumer-friendly and safe for families.

213.    3M advertised Scotchgard Protector in the mid-1950s as a coating that could be used to protect fabrics from water and other fluids.  From 1970 to 2002, paper and carpet treatments were the most common use of PFOS substances.

214.    On information and belief, 3M's Scotchban paper protector was used for non-food packaging as early as the 1950s and was later used in food paper packaging around 1970.  Paper mills would apply Scotchban solution to make paper cups, cake mixes, pet food, and more as the grease and water resistant chemicals would not impact the appearance or other properties of the paper.

215.    3M marketed its products to customers, misrepresented them as safe for household and family use, and failed to disclose the information regarding potential health and environmental issues to consumers necessary to make educated purchasing decisions.  For instance, this advertisement from 1961 promotes the benefits of Scotchgard products to families and children in the household without disclosing the known pollutant effects.

55

Case 2:25-cv-00869-DG-ARL Document 1-1 Filed 02/14/25 Page 57 of 80 PageID #: 82



216.    The advertisement below, on information and belief from 1965, advertises the

benefits of Scotchgard on a furniture company's products–especially when it comes to young

children.

56

Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 58 of 80 PageID #: 83



217.   Similarly this advertisement, on information and belief from 1967, falsely portrays

Scotchgard products as safe for family use:

57

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 59 of 80 PageID #: 84



218.    A 1981 ad continued to advertise Scotchgard products as safe for family use:

58

Case 2:25-cv-00869-DG-ARL Document 1-1 Filed 02/14/25 Page 60 of 80 PageID #: 85



219.     3M continued television advertising of Scotchgard products as safe for household and family use throughout at least the 1980s and continues to advertise and sell PFAS-containing products for consumer use up until the present day.

220.     Upon information and belief, 3M has marketed and sold PFAS containing products and PFAS chemicals for use in products and applications of other companies without disclosing the risks of these chemicals.

59

221.    Defendant Gore produced a variety of PFAS-containing products for consumer use including carpets, clothing, fabrics for furniture, paper packaging for food and other materials such as cookware that are resistant to water, grease or stains.

222.    Defendant Gore marketed many of its PFAS-containing products under its Gore-Tex line of products which was introduced in the 1970s. Gore-Tex is used in a wide variety of applications such as high-performance fabrics, medical implants, filter media, insulation for wires and cables, gaskets, and sealants. Gore-Tex fabric is best known for its use in water resistant rainwear and other clothing.

223.    Gore marketed Gore-Tex as a cutting-edge technology safe for use in various environments.  For example, this advertisement believed to be used in the early 1980s reflected Gore-Tex as materials safe for everyone from astronauts to fishermen:

60



224.    Similarly, in the late 1990s, Gore advertised Gore-Tex as a tool for going "back to nature," despite knowing Gore-Tex contained very unnatural and dangerous PFAS:

61

Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 63 of 80 PageID #: 88



225.    Upon information and belief, Gore has marketed and sold PFAS containing products and PFAS chemicals for use in products and applications of other companies without disclosing the risks of these chemicals.

226.    Defendant Honeywell and its subsidiaries produce hundreds of different lines of products for consumer and industrial use.  Among these product lines, Honeywell markets refrigerants, blowing agents, propellants, solvents, textiles and other materials which contain PFAS chemicals.

227.    Upon information and belief, Honeywell has marketed and sold PFAS chemicals for use in products and applications of other companies without disclosing the risks of these chemicals.

228.    Defendant AGC Chemicals is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  AGC Chemicals has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

62

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 64 of 80 PageID #: 89

229.    Defendant Archroma is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  Archroma has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

230.    Defendant Arkema is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  Arkema has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

231.    Defendant BASF is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  BASF has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

232.    Defendant Clariant is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  Clariant has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

233.    Defendant Daikin is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  Daikin has over decades produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

234.    Defendant Solvay is a leading chemical producer, with a central focus of its business being design and sale of chemicals for use in other products.  Solvay has over decades

63

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 65 of 80 PageID #: 90

produced a variety of PFAS chemicals and marketed and sold such chemicals for use in other products which are marketed to end users.

235.    Together, Defendants individually and collectively as a significant portion of the PFAS industry have produced sold and marketed PFAS and PFAS-containing products and chemicals for decades, leading to widespread and profound PFAS contamination of the Plaintiffs' communities.   These products have led to and proximately caused contamination of the environments in which the Plaintiffs liv(ed), work(ed) and/or otherwise interacted with either through the Plaintiffs' direct use of the PFAS containing products or through contamination of drinking water sources which resulted from the use of those products.

236.    Defendants engaged in willful, wanton, malicious, and or/reckless conduct that caused the foregoing damage upon Plaintiffs, disregarding their protected rights.

237.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS would not be released into the environment and inevitably contaminate Plaintiffs' property and water supplies.

238.    Defendants have caused great harm to Plaintiffs, acting with implied malice and an outrageously conscious disregard for Plaintiffs' rights and safety, such that the imposition of punitive damages is warranted.

## CAUSES OF ACTION

## COUNT I: DEFECTIVE DESIGN

239.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

64

240.    As manufacturers of products containing PFAS and/or their chemical precursors, Defendants owed a duty to all persons whom its products might foreseeably harm, including Plaintiffs, and to not market any product which is unreasonably dangerous in design for its reasonably anticipated use.

241.    Defendants' products were unreasonably dangerous for their reasonably anticipated uses for the following reasons:

    a.    PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

    b.    Even at extremely low levels, PFAS render drinking water unfit for consumption;

    c.    PFAS poses significant threats to public health; and

    d.    PFAS create real and potential environmental damage.

242.    Defendants knew of these risks and failed to use reasonable care in the design of their PFAS products.

243.    Products containing PFAS and/or their chemical precursors pose a greater danger to the environment and to human health than would be expected by ordinary persons such as Plaintiffs and the general public.

244.    At all relevant times, Defendants were capable of making products that did not contain PFAS and/or their chemical precursors.  Thus, reasonable alternative designs existed which were capable of preventing Plaintiffs' injuries.

245.    The risks posed by products containing PFAS and/or their chemical precursors far outweigh the utility of these products across various markets.

65

Case 2:25-cv-00869-DG-ARL   Document 1-1   Filed 02/14/25   Page 67 of 80 PageID #: 92

246.    The likelihood that Defendants' PFAS products would be released into the environment and contaminate drinking water sources far outweighed any burden on Defendants to adopt an alternative design and outweighed the adverse effect, if any, of such alternative design on the utility of the product.

247.    As a direct and proximate result of Defendants' unreasonably dangerous design, manufacture, and sale of products containing PFAS and/or their chemical precursors, Plaintiffs have been exposed to PFAS contamination.

248.    Defendants knew that it was substantially certain that their acts and omissions described above would results in contamination of people like the Plaintiffs.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

## **COUNT II: FAILURE TO WARN**

249.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

250.    As manufacturers of products containing PFOS, PFOA, and/or their chemical precursors, Defendants had a duty to provide adequate warnings of the risks of these products to all persons whom its product might foreseeably harm, including Plaintiffs and the public.

251.    Defendants' PFAS products were unreasonably dangerous for its reasonably anticipated uses for the following reasons:

    a.    PFAS causes extensive groundwater contamination, even when used in its foreseeable and intended manner;

66

b.  Even at extremely low levels, PFAS render drinking water unfit for consumption;

c.  PFAS poses significant threats to public health; and

d.  PFAS create real and potential environmental damage.

252.    Defendants knew of the health and environmental risks associated with their PFAS products and failed to provide a warning that would lead an ordinary reasonable user or handler of a product to contemplate the dangers associated with their products or an instruction that would have avoided Plaintiffs' injuries.

253.    Despite Defendants' knowledge of the environmental and human health hazards associated with the use and/or disposal of their PFAS products in the vicinity of drinking water supplies, including PFAS contamination of public drinking supplies and private wells, Defendants failed to issue any warnings, instructions, recalls, or advice regarding their PFAS products to Plaintiffs, governmental agencies, or the public.

254.    As a direct and proximate result of Defendants' failure to warn, Plaintiffs have been exposed to PFAS contamination.

255.    Defendants knew that it was substantially certain that their acts and omissions described above would result in exposure of people like the Plaintiffs to PFAS contamination. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

## COUNT III: NEGLIGENCE

256.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

67

257.    As manufacturers of products containing PFAS and/or their chemical precursors, Defendants owed a duty to Plaintiffs and to all persons whom its products might foreseeably harm and to exercise due care in the formulation, manufacture, sale, labeling, warning, and use of PFAS containing products.

258.    Defendants owed a duty to Plaintiffs to act reasonably and to not place inherently dangerous PFAS products into the marketplace when its release into the air, soil, and water was imminent and certain.

259.    Defendants knew or should have known that PFAS were leaching from their products due to their uses in the market.

260.    Defendants knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate water supplies if released into the environment.

261.    Defendants knew or should have known that the manner in which they were designing, manufacturing, marketing, distributing, and selling their PFAS products would result in the exposure of people like the Plaintiffs to PFAS contamination.

262.    Despite the fact that Defendants knew or should have known that PFAS are toxic, can contaminate water resources and are carcinogenic, Defendants negligently:

a.  designed, manufactured, formulated, handled, labeled, instructed, controlled, marketed, promoted, and/or sold products containing PFAS and/or their chemical precursors;

b.  issued deficient instructions on how their products should be used and disposed of, thereby permitting PFAS to contaminate groundwater;

68

c.   failed to recall and/or warn the users of their PFAS products of the dangers of groundwater contamination as a result of standard use and disposal of their products;

d.   failed and refused to issue the appropriate warning and/or recalls to the users of their products; and

e.   issued public statements intended to mislead the public into the false belief that PFAS are safe;

f.   failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

263.   The magnitude of the burden on the Defendants to guard against this foreseeable harm to Plaintiffs was minimal, as the practical consequences of placing this burden on the Defendants amounted to a burden to provide adequate instructions, proper labeling, and sufficient warnings about their PFAS products.

264.   As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their PFAS products, and to take steps to eliminate, correct, or remedy any contamination they caused.

265.   As a direct and proximate result of Defendants' negligence, Plaintiffs and people like plaintiffs have been exposed to PFAS contamination.

266.   Defendants knew that it was substantially certain that their acts and omissions described above would result in the exposure of people like the Plaintiffs to PFAS contamination. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for Plaintiffs' health and safety, and/or property rights.

69

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 71 of 80 PageID #: 96

## COUNT IV: PRIVATE NUISANCE

267.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

268.    Plaintiffs are owners of land, easements, and water rights that permit it to extract groundwater for use in its wells.

269.    Defendants' intentional, negligent, and/or reckless conduct, as alleged herein, has resulted in substantial contamination of Plaintiffs' supply wells by PFAS, human carcinogens that cause adverse human health effects and render water undrinkable.

270.    Defendants' manufacture, distribution, sale, supply, and marketing of products containing PFAS was unreasonable because Defendants had knowledge of PFAS' unique and dangerous chemical properties and knew that contamination of public groundwater supply wells was substantially certain to occur, but failed to provide adequate warnings of, or take any other precautionary measures to mitigate, those hazards.

271.    The contamination caused, contributed to, and/or maintained by Defendants substantially and unreasonably interferes with Plaintiff's property rights to appropriate, use, and enjoy water from its wells.

272.    Each defendant has caused, contributed to, and/or maintained such nuisance, and is a substantial contributor to such nuisance.

273.    As a direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiffs have incurred, are incurring, and will continue to incur damages related to PFAS contamination of its wells in an amount to be proved at trial.

70

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 72 of 80 PageID #: 97

274. Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage, including PFAS contamination of Plaintiffs' groundwater supply. Defendants committed each of the above-described acts and omission knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed to promote sales of PFAS products, in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare.

275. Therefore, Plaintiffs request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

276. Defendants are jointly and severally liable for all such damages, and Plaintiffs are entitled to recover all such damages and other relief as set forth below.

## **COUNT V: TRESPASS**

277. Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

278. Plaintiffs are owners, operators, and actual possessors of real property as defined herein.

279. Defendants designed, manufactured, distributed, marketed, and sold PFAS products with the actual knowledge and/or substantial certainty that products containing PFAS and/or their chemical precursors would, through normal use, release PFAS that would migrate into groundwater, causing contamination.

280. Defendants negligently, recklessly, and/or intentionally designed, manufactured, distributed, marketed, and sold PFAS products in a manner that caused PFAS to contaminate Plaintiffs' properties.

71

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 73 of 80 PageID #: 98

281.     As a direct and proximate result of Defendants' trespass, Plaintiffs have suffered and continue to suffer property damage requiring investigation, remediation, and monitoring costs.

282.     Defendants knew that it was substantially certain that their acts and omissions described above would threaten public health and cause extensive contamination of property, including groundwater collected for drinking.  Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or reckless disregard for the health and safety of others, and for Plaintiffs' property rights.

### COUNT VI. STRICT PRODUCT LIABILITY

283.     Defendants are strictly liable for the defective design of their PFAS containing products and PFAS chemicals.

284.     Defendants each had a duty to produce and market safe products. Defendants breached that duty when they marketed PFAS containing products and PFAS chemicals which were not designed to be reasonably safe.

285.     Defendants' products were defective in that they were designed to include PFAS Chemicals without sufficient safeguards to prevent exposure to such chemicals.

286.     In the alternative Defendants' products were defective in that they included PFAS or higher than intended concentrations of PFAS as a result of manufacturing defects.

287.     Moreover Defendants' products were defective as a result of a failure to provide adequate warnings regarding the safe use of and disposal of the products.

288.     The defective design was a substantial factor in causing plaintiffs' injuries.

72

### COUNT VII. MARKET SHARE LIABILITY, ALTERNATIVE LIABILITY, CONCERT OF ACTION, AND ENTERPRISE LIABILITY

289.    Defendants in this action are manufacturers that control a substantial share of the market for products containing PFAS, and/or their chemical precursors in the United States and are jointly responsible for the contamination of the Site, including the soil, sediment, surface water, and groundwater.  Market share liability attaches to all Defendants, and the liability of each should be assigned according to its percentage of the market for PFAS products at issue in this Complaint.

290.    Because PFAS is fungible, it is impossible to identify the exact Defendant who manufactured any given product containing a specific PFAS, and/or their chemical precursors found free in the air, soil or groundwater, and each of these Defendants participated in a territory-wide and U.S. national market for PFAS products during the relevant time.

291.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous products containing PFOS, PFOA, and/or their chemical precursors.

292.    Enterprise liability attaches to all the named Defendants for casting defective products into the stream of commerce.

### COUNT VIII: CONSPIRACY

293.    Defendants actually knew of the health and environmental hazards which PFAS posed to Plaintiffs.

294.    Beginning in the 1950s and continuing through the date of this Complaint, Defendants formed joint task forces and committees and otherwise colluded for the avowed

73

purpose of providing information about products containing PFAS to the public and to government

agencies with the unlawful purpose of:

  a.  Creating a market for products containing PFAS despite knowledge of the hazards which PFAS posed to the environment;

  b.  Concealing the environmental properties and toxic nature of PFAS and its impact on Plaintiffs and the environment; and

  c.  Maximizing profits in a way Defendants knew or should have known would result in the contamination of the Site.

295.  Defendants carried out their conspiracy by one or more of the following overt acts

or omissions:

  a.  Intentionally representing to the EPA and to the public that products containing PFAS were safe and did not pose an environmental or human health risk;

  b.  Concealing the dangers of PFAS (including toxicological information on the dangers of the chemicals to living organisms, adverse fate and transport characteristics, and the propensity of PFAS to contaminate groundwater) from the government and the public by, among other means, repeatedly requesting that information about the dangers and health effects of PFAS be suppressed and not otherwise published, and by downplaying any adverse findings relating to PFAS;

  c.  Concealing the dangers of products containing PFAS from end users, sensitive receptors, public water suppliers, and the users and consumers of groundwater;

  d.  Using their considerable resources to fight PFAS regulation; and

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 76 of 80 PageID #: 101

    e.    Collectively deciding to use PFAS rather than other, safer surfactants because products containing PFAS were the most profitable for Defendants.

296.    As a direct and proximate result of the Defendants' above-described conspiracy, PFAS, at all times relevant to this litigation has:

    a.    Posed and continues to pose a health threat to Plaintiffs because it has bioaccumulated in their bodies;

    b.    Contaminated Plaintiffs' property, soil, and groundwater, for those with private water wells;

    c.    Created the need for remediation of PFAS contaminated groundwater for those property owners who utilize private water wells, or, where remediation of the groundwater is impractical, installation of a system to filter out PFAS or procurement of water from alternative sources.

**COUNT IX: VIOLATION OF THE UNIFORM FRAUDULENT CONVEYANCE ACT (Against DuPont, Chemours Co., Chemours FC, Corteva and DuPont de Nemours, Inc.)**

297.    Plaintiffs adopt, reallege, and incorporate the allegations in the preceding paragraphs and further allege the following:

298.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York, against DuPont, Chemours Co., Chemours FC, Corteva, and DuPont de Nemours, Inc. (collectively the "UFCA Defendants"). C.R.S. NY CLS Dr & Cr, Art 10 §§270-281.

299.    The UFCA provides a "conveyance made" or "obligation incurred" is "fraudulent as to creditors as to both present and future creditors," and "without regard to his actual intent,"

75

when: (a) "the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital," NY CLS Dr & Cr §274; (b) "the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature," NY CLS Dr & Cr §275; or (c) made or incurred "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors[.]" NY CLS Dr & Cr §276.

300.    The UFCA Defendants (a) were engaged or were about to engage in a business for which the remaining assets of Chemours Co. were unreasonably small in relation to the business; (b) intended to incur, or believed or reasonably should have believed that Chemours Co. would incur, debts beyond its ability to pay as they became due; and (c) acted with actual intent to hinder, delay and defraud Plaintiffs and other potential creditors.

301.    UFCA Defendants engaged in acts in furtherance of a scheme to transfer the assets of DuPont out of the reach of parties such as Plaintiffs that have been damaged as a result of the UFCA Defendants' conduct, omissions, and actions described in this Complaint.

302.    It is primarily DuPont, rather than Chemours Co., that for decades manufactured, marketed, distributed and/or sold products containing PFOS, PFOA, and/or their chemical precursors with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate drinking water supplies.

303.    As a result of the transfer of assets and liabilities described in this Complaint, the UFCA Defendants have attempted to limit the availability of assets to cover judgments for all of

76

Case 2:25-cv-00869-DG-ARL     Document 1-1     Filed 02/14/25     Page 78 of 80 PageID #: 103

the liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of products containing PFOS, PFOA, and/or their chemical precursors.

304.    At the time of the transfer of its Performance Chemicals Business to Chemours Co., DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of products containing PFOS, PFOA, and/or their chemical precursors.

305.    The UFCA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and DuPont believed or reasonably should have believed that Chemours Co. would incur debts beyond its ability to pay as they became due.

306.    At all times relevant to this action, the claims, judgment and potential judgments against Chemours Co. have potentially exceeded its ability to pay.

307.    Pursuant to C.R.S. NY CLS Dr & Cr, Art 10 §§270-281, Plaintiff seeks avoidance of the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold the UFCA Defendants liable for any damages or other remedies that may be awarded by the Court or jury to Plaintiffs in this action.

308.    Plaintiffs further seeks all other rights and remedies that may be available to it under UFCA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiffs for the damages and injuries it has suffered as alleged in this Complaint.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 79 of 80 PageID #: 104

a.  a declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety of Plaintiffs;

b.  an award to Plaintiffs of general, compensatory, exemplary, consequential, nominal, and punitive damages;

c.  compensatory damages according to proof including, but not limited to:

    i.  costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent to which Plaintiffs' property and water system have been contaminated with PFAS;

    ii.  costs and expenses related to past, present, and future treatment and remediation of the PFAS contamination impacting Plaintiffs' property and water system; and

    iii. costs and expenses related to past, present, and future installation and maintenance of filtration systems to assess and evaluate PFAS contamination impacting Plaintiffs' property and water system;

d.  an order for an award of attorney fees and costs, as provided by law;

e.  pre-judgment and post-judgment interest as provided by law;

f.  an order barring the transfer of DuPont's liabilities for the claims brought in this Complaint;

g.  an award of punitive damages in an amount sufficient to deter Defendants' similar wrongful conduct in the future;

h.  an award of consequential damages; and

i.  an order for all such other relief the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable as a matter of right.

78

Case 2:25-cv-00869-DG-ARL    Document 1-1    Filed 02/14/25    Page 80 of 80 PageID #: 105

Dated: New York, New York
        January 3, 2025

Respectfully submitted,

**NAPOLI SHKOLNIK**

By: */s/ Nicholas Mindicino*
Patrick Lanciotti, Esq.
Andrew Croner, Esq.
Nicholas Mindicino, Esq.
360 Lexington Avenue, 11th Fl.
New York, New York 10017
(212) 397-1000
planciotti@napolilaw.com
acroner@napolilaw.com
nmindicino@napolilaw.com

Paul J. Napoli, Esq.
1302 Avenida Ponce de León
Santurce, Puerto Rico 00907
(833) 271-4502
pnapoli@nsprlaw.com

79